In re OHIO COPPER MINING CO.

Ex parte INTERNATIONAL INTER–CONTINENTAL MINING & REFIN-
ING CO. et al.

(District Court, S. D. New York.   December 2, 1916.)

1. BANKRUPTCY ⊜═⊃269—SALE OF BANKRUPT'S PROPERTY—CONFIRMATION.
    The property of a bankrupt corporation was sold on mortgage fore-
closure, and under the law of the place of the sale the bankrupt had six
months in which to redeem.   Thereafter the equity of redemption was
sold in the bankruptcy proceedings, but before confirmation of the
sale the property greatly appreciated in value, so that the equity of re-
demption was worth a substantial sum above the debts.   *Held*, that the
referee in bankruptcy properly refused to confirm the sale of the equity
of redemption, and allowed the stockholders time to form a committee to
buy in the property upon resale; the order providing for payment of all
debts of the corporation.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 370; Dec.
Dig. ⊜═⊃269.]

·2. BANKRUPTCY ⊜═⊃262(1)—SALE OF BANKRUPT'S PROPERTY—STOCKHOLDERS'
    COMMITTEES—BIDDING.
    In such case, the order allowing the stockholders an opportunity to
form committees and buy in the equity of redemption on resale by paying
all the debts of the corporation and expenses of administration should
have provided for competitive bidding, so that those stockholders not
parties to the reorganization plan would be protected, and the court
would not be under the duty of determining which bidder proposed the
more equitable reorganization; the stockholders being allowed to form
more than one committee.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 363; Dec.
Dig. ⊜═⊃262(1).]

3. BANKRUPTCY ⊜═⊃262(1)—SALE OF BANKRUPT'S PROPERTY—BIDS BY STOCK-
    HOLDERS.
    Where a sale of a bankrupt corporation's equity of redemption was
not confirmed, and stockholders' committees had several months' notice of
resale and of the terms, but only one made a bid in accordance with the
order of resale, accompanied by funds to pay the debts of the corporation,
etc., such bid should be accepted, and the property need not be again
exposed to sale for the benefit of other stockholders.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 363; Dec.
Dig. ⊜═⊃262(1).]

4. BANKRUPTCY ⊜═⊃269—ORDER OF REFEREE—OBJECTIONS.
    That an order of the referee for resale of a bankrupt corporation's
equity of redemption in property sold under mortgage foreclosure contain-
ed directions to the purchaser in the foreclosure beyond the power of the
court affords no ground for vacation, the purchaser not objecting.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 370; Dec.
Dig. ⊜═⊃269.]

5. BANKRUPTCY ⊜═⊃260—ORDERS OF REFEREE—EFFECT.
    Where an order of the referee for resale of the equity of redemption
of a bankrupt corporation in property sold under mortgage foreclosure
provided for payment of all debts in case of purchase of the property by
stockholders' committees, the inclusion of the provision releasing the
stockholders from liability is immaterial.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 360; Dec.
Dig. ⊜═⊃260.]

⊜═⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Bankruptcy. In the matter of the bankruptcy of the Ohio Copper Mining Company. On ex parte petitions by the International Inter-Continental Mining & Refining Company and others to review an order of the referee in bankruptcy denying confirmation of a sale of the bankrupt's property and authorizing a stockholders' committee to buy in the property. Order affirmed, and proceedings referred back to referee.

These are several petitions to review an order of a referee in bankruptcy dated November 6, 1916, the terms of which are summarized below. Five petitions were filed, seeking to review some or all parts of that order. The circumstances leading up to the order are as follows:

On September 11, 1914, the Ohio Copper Mining Company, a Maine corporation and the bankrupt herein, filed a voluntary petition in this court and was adjudicated a bankrupt in due course. The property of that company was incumbered by a mortgage previously executed to the Empire Trust Company as trustee to secure an issue of mortgage bonds of the face value of $1,242,000, upon which interest fell due on September 1, 1914. This default continuing for more than six months, on request of more than a majority of such bonds the trustee during the month of July, 1915, declared due the principal of the bonds in accordance with the mortgage and commenced with the leave of the bankruptcy court a suit of foreclosure in the District Court of Utah, the situs of the property in question. A decree of foreclosure followed on May 31, 1916, directing that the property be sold to satisfy the bonds, the total amount of which was found to be $1,397,746.80 with interest from March 1, 1916. Following this decree the property was duly advertised for sale in accordance with the appropriate statutes of Utah and struck down at auction on August 30, 1916, for the sum of $751,000 to a representative of a bondholders' committee, which had meanwhile been organized. The Utah court had appointed receivers, who were then and still are in possession of the property and at the present time in the receipt of large rentals due to the extraordinary rise in the value of metals.

Meanwhile, and on August 15, 1916, the bankruptcy court passed an order directing the sale of all the other assets of the Ohio Copper Mining Company on August 31, 1916, in Utah and at the same place as the sale in foreclosure the day before. These assets as described in said order and in the consequent advertisements consisted of the equity of redemption from the mortgage, all tools and mining supplies, all office furniture, certain specified choses in action, and the right of the trustees in bankruptcy upon stockholders' subscriptions. Under the laws of Utah, the owner, and certain other interested parties, of property subject to a mortgage have a period of six months within which to redeem from any sale in foreclosure, and the equity of redemption had therefore an actual, and indeed, as the event proved, a very large, value, beyond the purchase price and the bond issue. The bankruptcy sale was advertised according to law, and the auctioneer struck off the property as a whole for the sum of $40,000 to the same representative of the bondholders' committee who had bought under foreclosure on the day before. Becoming thus both purchasers under foreclosure and purchasers of the equity of redemption the bondholders were safe against any redemption under the Utah statutes, and the trustees in bankruptcy received for the assets of the company the sum total of $40,000.

Meanwhile objection had been made to the order of sale of August 15, 1916, and an effort made to secure its modification, which the referee denied by order of August 24, 1916. A proceeding, somewhat irregular in form, having been brought before the District Judge to review the referee's order of August 24, 1916, it was affirmed on September 1, 1916, by Judge Augustus N. Hand, who provided, however, that no application for confirmation should be made of any sale under the order of sale of August 15, 1916, until October 13, 1916. The purpose of this provision was to allow the stockholders by some joint action to redeem from the total indebtedness of the company and take it over either to the bankrupt or to a new company.

On October 17, 1916, the confirmation of the sale of August 31, 1916, was

brought on before the referee, and it then developed that two stockholders' committees were preparing to redeem from the foreclosure sale and give security for all the remaining indebtedness, consisting of the deficiency judgment in foreclosure and some $65,000 of unsecured indebtedness, together with the expenses of administration.

On November 6, 1916, after due deliberation, the referee upon the motion to confirm made the order now challenged which was in substance as follows: First he provided that any stockholders' committee might purchase the property by paying all the debts of the corporation and all expenses of administration to which purpose the funds already in hand should contribute. Second he fixed the 20th day of November, 1916, for a hearing at which should be computed the claims of all creditors and the administration expenses, the net amount necessary to redeem from the sale in foreclosure, the deficiency judgment for the bonds, and the settlement of the form of conveyance to the proposed new purchaser on redemption. Third, he provided that the trustees should redeem the property from foreclosure, as soon as the proper sum was paid into court, and that the purchaser on foreclosure should tender the certificate of purchase received from the Utah sheriff. Fourth, he provided that the trustees in bankruptcy should thereupon deliver a deed to the purchaser in redemption when he should pay the sum as fixed for redemption, and that the purchaser should release all stockholders from any liability. Fifth, he provided that any stockholders' committee might give five days' notice, compelling all other committees to contribute their shares of the redemption, and, if they failed, such committee might become the sole purchaser. Sixth, he provided a gross sum of $1,350,000 provisionally as purchase price in case the computation extended beyond November 20th. Seventh, he provided that any purchaser must offer to take all stockholders upon equal terms into the purchase. Eighth, he provided that, if any purchaser appeared and complied with the order of November 6, 1916, the motion to confirm should be denied, and if all committees failed it should be granted.

Here, strictly speaking, end the facts necessary for the consideration of the petitions of review; but the referee has likewise certified what took place on November 20th and 21st, when the hearing fixed in the order took place. The hearing was advertised twice in the newspaper, and both the North American Liquidation Company committee and the Central Trust Company committee had notice of it. On November 20, 1916, these two stockholders' committees offered to comply with the order of November 6, 1916, and on November 21, 1916, the North American Liquidation Company committee produced a check for $1,350,000, the amount fixed in the order. The referee took no action upon the bids, but certified the proceedings to the court.

Otto B. Schmidt, of New York City, for International Inter-Continental Mining & Refining Co.

Myers & Goldsmith, of New York City, for North American Liquidation Co.

Sullivan & Cromwell, of New York City, for Ohio Copper Co. bondholders' protective committee.

Emery H. Sykes, of New York City, in pro per.

Nash Rockwood and Alfred W. Kiddle, both of New York City, for trustees in bankruptcy of Ohio Copper Mining Co.

LEARNED HAND, District Judge (after stating the facts as above). [1, 2] It was of course within the power of the referee not to confirm the sale of August 31, 1916, and his refusal to do so in view of the larger possibilities of the situation was not only proper, but in justice necessary. The course he took, however, involved a situation which is at least anomalous in cases of this kind. He provided that any stockholders' committee might bid the amount of the indebtedness of the corporation and of the expenses of administration and

might receive a deed for the property from the trustees. Now under such an order two stockholders' committees might each bid the amount of the indebtedness and expenses, and the referee would find it impossible to award the property to either one without scrutinizing the terms of the reorganization upon which stockholders were to be admitted. The result of such a situation would inevitably force into the reorganization which the court thought best all those stockholders who had attempted to go into the others, and all others who had not entered any committees. As there was no provision by which any committee could bid a sum greater than the amount of the indebtedness and expenses, the stockholders who did not enter the successful reorganization would be excluded from any interest whatever in the property. Yet it might be that the property had a substantial value above the indebtedness and expenses which would appear in a competitive cash bidding. If so, each stockholder would be entitled upon dissolution of the corporation to his share of that surplus, which he might prefer to the rights he might get under the reorganization agreement. It must be remembered that as against a part only of the stockholders represented by a stockholders' committee the corporate entity may not be disregarded. It is only when all the stockholders are represented in the purchasing combination that their interests are identical with the corporation's, and that identity in the case at bar can be effected only by the short cut of saying that the opportunity of entering the successful reorganization is equivalent to a choice to do so. Stockholders have property rights which may not be dealt with in this way.

It was of course proper, since there had already been one sale, for the referee to provide that no stockholders' committee should be allowed to bid except upon the condition that all the indebtedness and administration expenses should be paid, and that if there were no such bid, the sale of August 31, 1916, should be confirmed, but it seems to me that the order was incomplete in failing to provide that the sale should be competitive, and that the property should go to that committee which bid the highest figure. It could have been provided, as in the case of purchase by bondholders, that such a percentage of the surplus as went to stockholders assenting to the successful reorganization might be paid by a mere credit upon their certificates of stock, but the sale should be permitted only in case there be a form of bidding which will insure to dissenting stockholders any value in cash which the property might bring. Then the court has nothing to say as to the terms of the reorganization agreement; it becomes a voluntary association among the stockholders, checked by the possible value which another set might pay in competition against them. But if the court is to compel all stockholders to enter a given reorganization which it may choose, it must charge itself with the duty of scrutinizing each agreement to see whether those terms are fairer than the possible cash value which might arise through their competition. This the court ought not to undertake.

[3] Now in fact there was only one bid accompanied by the necessary cash, and I think that the deficiencies in the order should be overlooked in view of that fact, since the referee has certified not only the

order, but what took place under the order on November 20 and 21, 1916. In short, if all parties had adequate notice, and only one appeared ready to conform to the necessary condition of any successful bid whatever, it would seem a barren thing to require the bidding to be made again. To do so, one must say either that there had not been fair opportunity for bids, or that the form of order, so far as erroneous, had discouraged bidding. There is no reason to suppose the latter.

As a practical matter the question therefore seems to me to turn upon the actual notice which the unsuccessful bidders had or might have had of those conditions which they were bound to meet. The only bidder on the 20th of November, 1916, besides the successful bid, was the Central Trust Company committee, who had begun to receive stock under a reorganization committee as early as September 25, 1911, and certainly knew the amount of the incumbrances upon the property. The attorney for this committee did not suggest, at the hearings on November 20th or 21st, that he had insufficient notice of the necessity of producing the cash to pay the indebtedness, but only asked for further time. Indeed, he said that he supposed when he came that no bid would be considered without cash. Nor did the attorney for the Madison Real Property & Security Company, Mr. Bien, make any such suggestion. The whole matter had been before this court on September 1, 1916, when Judge Augustus N. Hand gave further time to the stockholders to combine for the protection of the property. That was nearly three months before final action was taken, and meanwhile there had been much agitation of the possibilities of redemption. I cannot think that justice requires any further delay, or that a third offer should be made of this property for sale. The referee should therefore accept the bid of the North American Liquidation Company, as the only one which conformed with the necessary conditions for any sale.

[4] In spite, therefore, of the irregularity of the order of November 6, 1916, it will be affirmed. It is true that the order directing Sykes as purchaser in foreclosure to accept the redemption and assign the sheriff's certificate is beyond the powers of this court; but Sykes does not complain of it, and that provision will not, therefore, be disturbed.

[5] So far as concerns the release of the stockholders from liability, it is proper, though hardly necessary, since that liability can in no event be available when all the debts have been paid. Even if it included mortgage debts, it would be extinguished. Nor will that provision be modified which directs the payments to bondholders to be indirect.

The proceedings will be referred back to the referee to accept the bid of the North American Liquidation Company and to execute the order of November 6, 1916, in accordance with its terms.